IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNTS LAVISHEXOTICRENTALS.OC.LA AND OTPLUGDISTRO THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 3:23-sw- 67

**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher M. Page, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Instagram accounts stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), an electronic communications service and/or remote computing service provider headquartered at 1601 Willow Road, Menlo Park, California 94025.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations

("HSI") and am assigned to the office in Richmond, Virginia, which is conducting a federal Grand Jury investigation referred to in this affidavit. I have been employed by HSI as a Special Agent since December 2019 and I have attended classes and courses conducted by local, state, and federal agencies regarding the use of the internet and social media platforms regarding the importation, transportation, and distribution of illegal drugs.

3.      Prior to assuming my position with HSI, I was employed as a State Trooper with the Virginia Department of State Police ("VSP") for eight years. During my time as a State Trooper, I was trained to investigate many types of state violations of law to include motor vehicle and criminal statutes. Specifically, I spent six years as a State Trooper assigned to the Counter-Terrorism and Criminal Interdiction Unit (CCI). While assigned to CCI, I investigated numerous incidents of narcotics and currency smuggling as well as other types of interstate smuggling.

4.      Through investigations and training, I am knowledgeable about state and federal drug laws, and I have participated in a number of drug trafficking, money laundering, and organized crime investigations that have resulted in the arrest and conviction of numerous members of several different international and domestic DTOs for violations of state and federal drug laws, and the seizure of illegal drugs, U.S. currency, and forfeitable assets. Several of these investigations have employed the use of the internet and social media platforms. Specifically, in this federal Grand Jury investigation, numerous state and federal search warrants have been obtained of social media profiles.

5.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 and 18 U.S.C. § 1956 have been

2

committed by **THOMAS DUONG** ("DUONG") and **BLAKE LEMIEUX** ("LEMIEUX"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8.      In July 2017, Chesterfield County Police Department ("CCPD") began investigating Lamar THOMPSON as the leader of a local drug trafficking organization ("DTO") for distributing multi-kilogram quantities of marijuana and cocaine in Chesterfield County, VA and other surrounding areas.[1]

9.      This federal Grand Jury investigation has revealed THOMPSON's source of supply for marijuana is **DUONG** and **LEMIEUX**, based in Orange County, CA, and leaders of the **DUONG** DTO. The **DUONG** DTO utilizes couriers flying commercial airlines to transport marijuana to cities across the U.S. to include VA in Richmond, Norfolk, and Northern VA; North Carolina in Charlotte, Greensboro, and Raleigh; South Carolina in Columbia, Greenville, and Charleston; New York in Syracuse and Albany; Ohio in Cincinnati and Toledo; Savannah, Georgia; Baltimore, Maryland; Tampa, Florida; Pittsburgh, Pennsylvania; Charleston, West Virginia; Knoxville, Tennessee; Huntsville, Alabama; Jackson, Mississippi; Baton Rouge,

---

[1]      HSI joined the investigation in December 2020.

Louisiana; Detroit, Michigan; and Evansville, Indiana. These same couriers then return to Orange County, CA, via commercial airlines with drug proceeds secreted in checked luggage.

10.    Members of CCPD and HSI have conducted physical surveillance coupled with electronic surveillance of suspected couriers while in Richmond, VA, on more than one dozen instances. During their trips to Richmond, VA, the couriers have been observed meeting with associates of THOMPSON.

11.    On September 19, 2020, CBP officers seized $19,381 in U.S. currency from known marijuana and currency courier for the DUONG DTO, Johana MERCADO, at the San Ysidro, CA Point of Entry while MERCADO was traveling to Mexico. A cellular telephone was recovered from MERCADO and searched pursuant to border-search authority. A forensic examination of MERCADO's cellular telephone revealed photographs and text message communication with other individuals about how they can make $2,000 per trip flying with two checked suitcases of vacuum-sealed marijuana to VA and NC and bringing U.S. currency back to CA in checked suitcases. MERCADO's text messages further revealed that once the individual arrives to the destination, **DUONG** would contact the individual and a local contact from the distribution city would arrive to the hotel and retrieve the suitcases. Location data from the forensic examination of MERCADO's telephone placed it near 20312 Loyal Avenue, South Chesterfield, VA 23803 on September 13, 2020. This location was later discovered to be an open field next to a residence, 20310 Loyal Avenue, a suspected stash location for the **DUONG** DTO.[2]

---

[2]    At the time, 20310 Loyal Avenue, South Chesterfield, VA, was utilized by THOMPSON and his associates as a stash location and couriers were suspected of traveling to this location to distribute narcotics and obtain the proceeds to return to CA. The Loyal Avenue address is believed to be owned/occupied by the grandfather of Tyrell Fields, who was an associate of THOMPSON, until Tyrell's death on October 8, 2020. Based on physical and electronic surveillance, following Fields' death, it appeared THOMPSON and his associates no longer utilized the Loyal Avenue address.

12.    Text messages from the extraction identify an individual named "TD" or "T". Text messages between MERCADO and TD referenced setting up travel arrangements, paying couriers, and smuggling currency and marijuana. The contact information for TD had a phone number as well as a picture of an Asian male. Upon investigation, the phone number and photo were found to belong to **DUONG**.

13.    **LEMIEUX** has been the subject of two currency seizures of suspected proceeds of illegal activity, specifically narcotics distribution, in Tampa, FL, and Richmond, VA. Also in 2018, **LEMIEUX** and his father were arrested in the Baltimore, MD, metropolitan area with approximately 192 pounds of marijuana from a freight delivery destined for Richmond, VA. Further, **LEMIEUX** is suspected of coordinating marijuana, THC edibles, and mushroom distribution to multiple individuals across the United States to include Chicago, IL and Indianapolis, IN.

14.    On February 15, 2023, I seized approximately 462 grams of marijuana, 238 grams of mushrooms, and 125 grams of THC edibles from the Chesterfield Police Department. The marijuana and mushrooms were seized by Chesterfield Police Department on February 8, 2023, from a UPS store located at 9601 Coach Rd., Richmond, VA 23237. The marijuana and mushrooms were destined for Tucker Woodfin, 8013 Whitebark Ter., North Chesterfield, VA 23237, from Huntington Beach, CA. This parcel was the subject of a controlled purchase from coordination via Telegram with a channel named "OTPLUGEXCLUSIVEDISTRO." Law enforcement paid for the narcotics with money orders, and when the money orders were sent, the payee section was blank. **DUONG** deposited the money orders into bank accounts associated with **DUONG**, and the money orders were made payable to **DUONG**. This information leads me to believe that **DUONG** wrote his (**DUONG**) name on the money orders before depositing.

15.     On February 16, 2023, I seized approximately 2,721 grams of marijuana, 234 grams of mushrooms, and 453 grams of THC edibles from the Chesterfield Police Department. The marijuana, THC edibles, and mushrooms were seized by Chesterfield Police Department on February 16, 2023, from a UPS store located at 9601 Coach Rd., Richmond, VA 23237. The marijuana, THC edibles, and mushrooms were destined for Tucker Woodfin, 8013 Whitebark Ter., North Chesterfield, VA 23237, from Huntington Beach, CA. This parcel was the subject of a controlled purchase from Telegram channel "OTPLUGEXCLUSIVEDISTRO."

16.     On March 8, 2023, United States Magistrate Judge for the Eastern District of Virginia, the Honorable Mark Colombell, signed an § 2703(d) Order to disclose information related to Instagram accounts LAVISHEXOTICRENTALS.OC.LA (instagram.com/lavishexoticrentals.oc.la) and OTPLUGDISTRO (instagram.com/otplugdistro). The Instagram account LAVISHEXOTICRENTALS.OC.LA came to investigators' attention in the production of a search warrant on **DUONG**'s private Instagram page.[3] On March 8, 2023, I served the Order on Instagram. On April 12, 2023, I received production from Instagram related to Instagram accounts LAVISHEXOTICRENTALS.OC.LA and OTPLUGDISTRO.

17.     A review of the production for LAVISHEXOTICRENTALS.OC.LA revealed the verified phone number associated with the account is (714) 906-6562. This phone number is an AT&T cellular telephone subscribed in the name of **Agha ABBAS**. **ABBAS** has been identified as a former marijuana and currency courier for the **DUONG** DTO. This assertion is based on an interdiction conducted by HSI Special Agents at Charlotte-Douglas International Airport in

---

[3] On August 1, 2022, the Honorable Mark R. Colombell authorized a search warrant of **DUONG**'s Instagram account under the username TD___BOSSUPPP, 3:22-sw-141.

Charlotte, NC. **ABBAS'** checked luggage was found to contain $119,880 in U.S. currency. **ABBAS'** phone was seized later pursuant to border search authority while crossing into Mexico via the San Ysidro, CA port of entry. A review of the contents of **ABBAS'** phone revealed multiple communications with **DUONG** and other members of the **DUONG** DTO discussing distribution operations of the **DUONG** DTO.

18.     On April 13, 2023, I located business documents on the California Secretary of State's website regarding a "Statement of Information" for Lavish Exotic Rentals. Upon review, there were three manager or member names listed on the document dated November 15, 2022, **DUONG** (CEO), **LEMIEUX**, and **ABBAS**, electronically signed by **DUONG**. A "Statement of Information" dated December 5, 2022, revealed **ABBAS'** name removed from the business, electronically signed by **DUONG**.

19.     A review of Instagram account "OTPLUGDISTRO" shows approximately twenty-one publicly visible photos. Multiple photos show scantily clad women posing in front of high-end luxury vehicles to include a black Rolls Royce Cullinan, a white Lamborghini Urus, and a white Lamborghini Aventador SVJ. The investigation has revealed **LEMIEUX** owns a black Rolls Royce Cullinan and **DUONG** owns a white Lamborghini Urus and a white Lamborghini Aventador SVJ.

20.     A review of the production for "OTPLUGDISTRO" revealed the verified phone number associated with the account is (949) 354-9556 and the email address is alord7784@gmail.com. This phone number is a T-Mobile cellular telephone subscribed in the name of Jason Minh with a billing address of 7831 Beach Blvd., Huntington Beach, CA.[4] To date,

---

[4]     An open-source search of this address revealed that the address does not exist.

the investigation has not revealed any individual by the name Jason Minh. While communicating via Telegram with the account associated with "OTPLUGEXCLUSIVEDISTRO" the username is "ALord OTplug."

    21.    On March 22, 2023, United States Senior Judge Honorable Henry Hudson signed an Order authorizing interception of wire and electronic communications occurring over (949) 619-1070. The investigation has revealed that cellular telephone is being utilized by **LEMIEUX**. On April 20, 2023, at 9:34 p.m., **LEMIEUX** received an incoming text message on (949) 619-1070 from an unknown male using (321) 914-9361 (hereafter referred to as **UM9361**) that began the following conversation.

| Time | Date | Sender | Conversation |
|------|------|--------|-------------|
| 9:34 p.m. | 04/20/2023 | **UM9361** | *"Yoo"* |
| 9:34 p.m. | 04/20/2023 | **LEMIEUX** | *"Yoo"* |
| 9:34 p.m. | 04/20/2023 | **UM9361** | *"Send telegram link"* |
| 9:35 p.m. | 04/20/2023 | **LEMIEUX** | *"https://t.me/winnerscirclecamenu"* |
| 9:35 p.m. | 04/20/2023 | **UM9361** | *"This my view phone"* |
| 9:38 p.m. | 04/20/2023 | **LEMIEUX** | *"https://t.me/TheOTplugDistroExclusive"* |
| 9:39 p.m. | 04/20/2023 | **LEMIEUX** | *"We run both companies"* |

    22.    The above link sent by **LEMIEUX** at 9:38 p.m. is to the same Telegram page where law enforcement has conducted the previously described controlled purchases of narcotics. Upon further review, the Telegram description includes a link for an associated Instagram account with the URL *instagram.com/otplugdistro*, indicating common ownership of the "OTPLUGEXCLUSIVEDISTRO" Telegram channel and the "OTPLUGDISTRO" Instagram account. Further, the Instagram channel includes pictures of expensive vehicles of the same types

owned by **DUONG** and **LEMIEUX**, and **DUONG** and **LEMIEUX** both have extensive ties to drug trafficking conducted through the "OTPLUGEXCLUSIVEDISTRO" Telegram channel.

23.    I am conducting a money laundering investigation into **DUONG, LEMIEUX,** and other associates. Based on the investigation to date, the Instagram accounts "OTPLUGEXCLUSIVEDISTRO" and "LAVISHEXOTICRENTALS.OC.LA" are utilized by **DUONG, LEMIEUX,** and other associates to advertise their narcotics distribution business, and non-public information possessed by Meta will help in uncovering a full understanding of the **DUONG** DTO distribution network and assist in identifying other conspirators.

24.    Social media has become a heavily utilized tool by distributors of illegal narcotics to communicate.  Frequent posting of photographs and videos to social media also allows law enforcement to identify other conspirators based on profile tags and messages.

25.    I believe that the information held by Meta will contain information that will help identify **DUONG**'s source of supply, other conspirators, telephone numbers, and assets derived from criminal proceeds.  The information likely to be obtained from the data help by Meta is relevant and material to the ongoing federal Grand Jury investigation.

## BACKGROUND CONCERNING INSTAGRAM[5]

26.    Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile

---

[5]    The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

27.     Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

28.     Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

29.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

30.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account or transfer an image from Instagram to a connected image printing service. Meta maintains records

10

of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

31.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

32.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

33.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

34.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can

remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

35. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

36. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

37. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

38. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the

recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

39.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

40.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

41.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

42.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

43.    In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other

users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

44.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

45.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

46.     The stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

47.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use

an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

48.      Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.      Based on the financial investigation being conducted, **DUONG** is suspected of utilizing multiple bank accounts and institutions to launder the proceeds of his marijuana trafficking operations. Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

50.      It is believed that **DUONG** is utilizing Meta's servers to communicate and display his lifestyle which is suspected to be funded by the illegal proceeds of his marijuana distribution network. Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

51.     Based on the foregoing, I request that the Court issue the proposed search warrant.

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

53.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*Christopher M Page*
_____
Christopher M. Page, Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Reviewed and Approved by AUSA Shea Gibbons

Subscribed and sworn to before me this **25** day of April 2023.

_____
Honorable Summer L. Speight
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Instagram accounts

"OTPLUGDISTRO" and "LAVISHEXOTICRENTALS.OC.LA", that are stored at premises

owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at

1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.    All business records and subscriber information, in any form kept, pertaining to the account, including:

    1.    Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

    2.    All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

    3.    Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

    4.    Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

    5.    All advertising information, including advertising IDs, ad activity, and ad topic preferences;

    6.    Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, July 1, 2022, to April 24, 2023;

    7.    Privacy and account settings, including change history; and

8.    Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.    All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata July 1, 2022, to April 24, 2023;

C.    All content, records, and other information relating to communications sent from or received by the account July 1, 2022, to April 24, 2023, including but not limited to:

1.    The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.    All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.    All associated logs and metadata;

D.    All content, records, and other information relating to all other interactions between the account and other Instagram users July 1, 2022, to April 24, 2023, including but not limited to:

1.    Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.    All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.    All contacts and related sync information; and

4.    All associated logs and metadata;

E.    All records of searches performed by the account July 1, 2022, to April 24, 2023; and

2

F.     All location information, including location history, login activity, information geotags, and related metadata July 1, 2022, to April 24, 2023.

Meta is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 21, U.S.C., § 841 and Title 18, U.S.C., § 1956, those violations involving **THOMAS DUONG** and **BLAKE LEMIEUX** and occurring after July 1, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

A.    Evidence indicating the sale of illegal drugs, laundering of the proceeds from the sale of illegal drugs, and preparatory steps taken in furtherance of the scheme

B.    Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

C.    Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

D.    The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s).

E.    The identity of the person(s) who communicated with the account holder about matters relating to narcotics distribution and money laundering, including records that help reveal their whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b. such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                                  Signature

5